Nolvert P. SCOTT, Jr., Individually and on behalf of all other persons similarly situated, Plaintiff,

v.

The UNIVERSITY OF DELAWARE et al., Defendants.

Civ. A. No. 74–58.

United States District Court, D. Delaware.

Aug. 16, 1978.

John S. Grady and Thomas S. Neuberger of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

John P. Sinclair of Potter, Anderson & Corroon, Wilmington, Del., for defendants.

Marilyn S. G. Urwitz, EEOC, Washington, D. C., amicus curiae.

## OPINION

STAPLETON, District Judge:

Dr. Nolvert P. Scott, Jr. ("Scott") brought this class action against the University of Delaware ("the University"), its Board of Trustees, and other University officials and faculty members, alleging racial discrimination in the hiring, discharge, recruitment, promotion, supervision, wages, terms, conditions and privileges of employment of its faculty. Scott seeks a declaratory judgment, reinstatement and damages on his own behalf, and injunctive relief on behalf of the class which he represents. In an Opinion dated November 20, 1974,[1] this Court held that the complaint stated a claim under Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. § 2000e *et seq.,* as well as under 42 U.S.C. §§ 1981 and 1983. In an Opinion dated September 11, 1975,[2] this Court certified the action as a class action on behalf of all blacks who have been, or in the future will be, discriminated against on the basis of race with respect to the above enumerated employment prac-

tices. On September 14, 1976, this Court denied the defendants' motion to decertify the class. After a four week trial, the case is now ready for final disposition. This Opinion constitutes the Court's findings of fact and conclusions of law.

## I. BACKGROUND FACTS.

### A. *Historic Background.*

While Delaware College, the predecessor of the University, was founded as a private institution, there has been significant state involvement with it since 1867 when it was designated by the General Assembly as the State of Delaware's land grant college. The details of the State's subsequent and increased involvement in the affairs of the University are set forth in a stipulation admitted into evidence at trial.[3] It will suffice for present purposes to find that the State's involvement is, and for decades has been, sufficient to make the University's actions actions of the State for purposes of the Fourteenth Amendment. *Parker v. University of Delaware,* 31 Del.Ch. 381, 75 A.2d 225 (1950).

Prior to 1948, there was no black faculty at the University and black students were not eligible for admission. Following the pattern in most southern states, the University of Delaware served the white population of the State while Delaware State College served the black population. In 1948, the Board of Trustees of the University approved a resolution permitting the enrollment of black students who were residents of Delaware, but only if they were enrolled in programs of study which were not available in other state-supported institutions in Delaware. (PX–8, C–117). In 1950, ten black students who had been denied admission to the University brought a class action

---

**1.** *Scott v. University of Delaware,* 385 F.Supp. 937 (D.Del.1974). That Opinion also discusses Scott's filing of a charge of discrimination with the Equal Employment Opportunity Commission, and the right to sue letter he received, which will not be repeated here.

**2.** *Scott v. University of Delaware,* 68 F.R.D. 606 (D.Del.1975).

**3.** (PX–33). The facts recited in that stipulation are hereby incorporated into these findings by reference. The University's relationship to the State is also reviewed in *Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974).

in the Delaware Court of Chancery. (PX-8; C-117, 118). The court there upheld the plaintiffs' claim of a Fourteenth Amendment violation and issued an injunction prohibiting the University from denying admission solely on the basis of race. *Parker v. University of Delaware,* 31 Del.Ch. 381, 75 A.2d 225 (1950).

Even after 1950, however, few black students attended the University. Between 1951 and 1969, only 37 black students received Bachelor's Degrees, while 52 received graduate degrees. (PX-8). Until 1961, black students were not allowed to room with white students. (PX-3).

It was not until the last half of the 60's that affirmative efforts were made to encourage black students to come to the University and to attract black faculty. Although these efforts have continued to the present, they have not succeeded in attracting sufficient black students to make the University's student body an accurate reflection of its community. Nor have they resulted in the hiring of sufficient black faculty members to make the University's faculty reflective of the national academic community. A summary of these efforts is important, however, to put the questions now before the Court in perspective.

Since 1966, the University has operated an "Upward Bound" program designed to identify black students with potential for successful college performance, to motivate them to seek college admission, to recruit them for the University, and to provide them with supportive educational services. (PX-8). In 1970, this was supplemented by the inauguration of a "College Try" program to provide supportive educational services to students of low income families during their freshman and sophomore years. (PX-8). In 1968 the admissions office developed a program to attract black students other than through "Upward Bound" and began to apply techniques other than the traditional admissions criteria in evaluating the college potential of black students.[4]

Dr. Edward A. Trabant became President of the University in September of 1968. On October 1, 1968, he wrote a letter to the presidents of approximately 250 colleges and universities, including those which traditionally have had large black enrollments, expressing the University's interest in attracting black faculty and urging the recipients of the letters to refer blacks beginning careers in higher learning or those with prior faculty or administrative experience to him. (DX-48). Letters of similar import were dispatched by the Provost and the Vice President of Academic Affairs. During the same month, President Trabant established an "Advisory Committee on Policies, Programs and Services Affecting Blacks and Other Minority Group Students". The purpose of this group was to advise the University as to how it might most effectively attract and serve black and other minority students. The product of this group's effort was the Scarpitti Report (PX-2) named *after its chairman, Professor* Frank R. Scarpitti. This report was presented to the President on March 7, 1969.

The 1968 letters initially produced a list of 53 potential candidates. The follow-up efforts found that many of those were not interested or were seeking positions which the University did not have open. Twenty-six were selected as candidates, and of these, 16 were interviewed and 11 were offered jobs. Seven declined the offers and 4 accepted.[5] This follow-up was reported to all members of the faculty and each was asked to assist in recruiting potential black faculty members. (DX-49).

The Scarpitti Report (PX-2) made numerous and significant recommendations in

---

4. Other contemporary efforts involved work with guidance counselors in predominantly black high schools in Delaware and surrounding states, meetings with community organizations to stimulate interest in the black community, on-campus group meetings with selected black students, waiver of application fees, appointment of a black admissions officer to recruit black students, etc. (e. g. Worthen M-51-71).

5. Three of the four joined the professional staff and only one became a faculty member.

such areas as black representation on the Board of Trustees, black student and faculty recruitment, creation of a Black Studies Department, social and cultural programs for black students, and additional financial aid to blacks, etc. There was prompt (DX–53) and sustained (DX–54) follow-up to implement most of these suggestions, (e. g. Trabant, N–28–31).

Pursuant to Executive Order No. 11246, the University became obligated to comply with certain federal regulations relating to minority hiring. (41 C.F.R. § 60.2). These require that if an employer doing contract work for the federal government has a work force in which minorities are under-utilized, an affirmative action program must be undertaken. In 1972 the University implemented an Affirmative Action Program which included the area of full time faculty hiring and which will be described in some detail hereafter. (PX–44). This program was overseen by an Affirmative Action Office, headed by a "Coordinator". The first coordinator was Jeannette Sam. Ms. Sam's services were supplemented in 1974 by retention of the services of an Assistant Coordinator, Mr. James Turner. Mr. Turner, a black, has since succeeded Ms. Sam as Coordinator.

While these efforts have not been as successful as originally hoped, they have involved a substantial commitment of resources and do demonstrate a concern on the part of the administration about the underrepresentation of blacks in the student body and on the faculty.[6]

The number of black students in the freshman class rose steadily from 16 (0.9%) in 1967 to 221 (7.8%) in 1972. Despite the increased number of black freshman enrolled, however, the overall size of the student body has grown at a substantial rate,

and it appears that during the 1976–77 school year the undergraduate student body was only 3.4% black.[7] During the same period the graduate student body had a 1.8% black population. (PX–8, PX–55).

### B. The Sociology Department And Dr. Nolvert P. Scott, Jr.

In 1967 the Sociology Department at the University was made up of eight full time faculty members. It awarded a Bachelor of Arts and a Master's degree and there was little emphasis on research, scholarship or publication. In the fall of 1967, implementation of a basic policy decision of the President and Trustees was begun. A Doctor of Philosophy Program was to be developed and a new emphasis was to be placed on scholarship and the advancement of knowledge. Four new faculty members, including Dr. Scarpitti, arrived on campus to aid in effectuating this change. (Scarpitti, F–7–9).

In 1969, Dr. Scarpitti became Department Chairman and the Ph.D. program was inaugurated. The teaching load for all faculty members was dropped to six hours and it was understood that at least half the working time of each member would be spent doing research and writing. Between 1969 and 1977 the Department grew from eight full time positions to twenty-one full time positions and became more specialized.[8] In recruiting for these new positions, the Department sought people who had, in the words of its Chairman, "the capabilities of making significant contribution to scholarship that would bring the recognition to the University that we all wanted, the recognition as a scholarly department." (Scarpitti, F–9).

6. There is testimony in the record regarding an unfortunate meeting of a black delegation from the University community and their lawyer with President Trabant and the University's lawyer at which a substantial amount of heat was generated. (Williams A–116–120). While the irritation of the black representatives is understandable, I do not infer racial bias or indifference on Dr. Trabant's part from his conduct on that occasion.

7. This represents 439 black students. (Worthen, M–56).

8. On the graduate level the department concentrates in six areas: deviance, criminal justice, urban sociology, complex organization, sociology theory and sociological methods. (Scarpitti, F–11).

When new faculty members were hired, they were provided with a copy of the "Personnel Policy" of the Sociology Department, which was originally promulgated in 1969. (DX–8; Scarpitti, F–21). This document purported to state the criteria to be applied in making departmental recommendations for renewal of contracts, promotions in rank and conferral of tenure, as well as the procedure to be followed in reaching such recommendations. The "criteria" section states, in part, as follows:

> The criteria fall into three general categories: (1) teaching efforts and effectiveness, (2) scholarly activity, and (3) service to the department, the University, the community. Criteria in all three categories will be considered in formulating a recommendation.

Dr. Nolvert P. Scott, Jr. was recruited by the University during the 1970–71 school year. He visited the campus and was hired in preference to two other candidates pursuant to a vote of the members of the Sociology Department. At the time of the hiring he had had eight years of teaching experience and was teaching at a Canadian university. (Scott, B–44–45). He was an "ABD" ("all but dissertation"), meaning that he had completed all of the requirements for a Ph.D. except the dissertation requirement. Dr. Scott asked for and received a commitment to pay him at a rate of $15,000 during the first year of his three year contract, if he had received his Ph.D. degree by the time he reached the campus in September of 1971. This was $3,000 above the rate which the Sociology Department had been paying for Ph.D.'s. (Scarpitti, F–40).

During his discussions with the sociology faculty, Dr. Scott was informed that the practice was to evaluate for possible contract renewal at the end of a candidate's second year so that he would have a full year's notice in the event of non-renewal.

Dr. Scott was evaluated at the end of his second year and a decision was made not to renew his contract. The decision was made by a vote of 9 to 1 of the department faculty, with two abstentions. (Scarpitti, F–85). Dr. Scott was advised on May 8, 1973 that his contract would not be renewed when it expired in August of 1974. (PX–9).

### C. *The Challenged Employment Practices.*

Dr. Scott presses both disparate treatment and disparate impact claims. First, he asserts that the decision not to renew his contract was racially tainted. In support of this assertion, he cites evidence of other episodes in his life at the University which he perceives as being indicative of racial bias toward him and evidence tending to show that other non-black professors, whom he maintains were similarly situated, were retained for an additional contract term.

In addition, Dr. Scott has maintained throughout this litigation that numerous employment practices at the University have a disparate impact upon blacks and, accordingly, have operated to the disadvantage of himself and other members of the class he represents. During trial, these disparate impact claims were narrowed, and his brief focuses, first, upon the recruitment and hiring practices of the University and, second, upon its practices with respect to contract renewal, promotion and conferral of tenure.

### 1. *The criteria.*

The University is composed of nine colleges, which contain forty-one separate departments. There are four different ranks among the full time faculty: Professor, Associate Professor, Assistant Professor, and Instructor (or Lecturer). Since at least 1969, the Handbook for Faculty has set out general principles established for university-wide use in appointments to these positions. (PX–88). A "Masters degree (or its equivalent)" is stated as being required for an Instructor's position and a "Ph.D. Degree (or its equivalent)" is stated as being required for the other three positions.[9] In

---

9. It is noted that for "appointments that involve limited professional duties and for certain highly technical fields" the degree or its equivalent requirement may be modified.

each instance, varying levels of attainment in teaching and scholarship are set forth as requirements. Finally, the Handbook specifies that Instructor appointments shall be for a term of one year, Assistant Professor appointments for a term of one to three years (renewable for similar periods), Associate Professor appointments for a term of three years or "without term" where the candidate has been at the University for three years or more, and Professor appointments without term.

Within the boundaries of these general principles, the University follows a policy of decentralized decision-making. It requires that each individual department adopt more specific criteria, establish its own procedural rules, and make its own recommendations on appointments. (PX–88). Some control of this decentralized process is maintained, however. In the fall of 1972, the various departments were required to submit written statements regarding their personnel policies. These were subject to the approval of the University Tenure and Promotion Committee and the Provost. They were to state the criteria on which recommendations would be based, the weight various criteria would be given, and the kinds of evidence by which attainment of the stated criteria would be judged. They were also to state the procedure to be followed and provide for a statement of the reasons for a decision to go to the candidate.

The departmental statements filed in response to this requirement are contained in the record as a part of PX–72. Many, in accordance with the directive, expressly purport to deal only with promotion, renewal and tenure decisions. Others expressly cover recruitment and initial hires as well. As far as the criteria for appointment are concerned, however, the record indicates that the criteria stated as governing appointments to Assistant Professor, Associate Professor and Professor positions by

promotion from within are also applied in filling those same positions from without by hire. Thus, in the criteria area, even those departmental statements which do not expressly cover initial hire are nevertheless helpful in determining the hiring criteria.

While the policies and procedures vary to a degree from department to department, certain generalizations can be made based on a review of PX–72 and the rest of the record. First the stated criteria uniformly relate not only to teaching and scholarship, but also to what is referred to as "service", meaning service to the department, the University or the larger community. Thus, while variously stated in more specific criteria, the three general criteria considered by all departments in making promotion, renewal, and tenure decisions are teaching effectiveness, scholarly achievement, and service. As one would expect, accomplishments and/or potential in these areas is what is looked for in making decisions on initial appointments as well.

While the relevant criteria are thus relatively subjective, the departmental statements add specificity to the decision-making process in several ways. In addition to more specific subcriteria in many instances, the statements refer to the kinds of evidence which the decision-makers will consider as reflecting teaching effectiveness [10] and the other criteria.[11] In addition, almost all departmental statements give some indication of the relative importance of the criteria. Some departments assign percentages; others have point systems. Some are more general in approach, stating for example, that all three are given equal weight or that teaching and scholarship are weighted equally, with service being a secondary consideration. Still others allow candidates to select areas of emphasis and to be evaluated accordingly.

The one notable exception to the weighting statements is the policy statement of

---

10. Student evaluations, for example, are mentioned by a number of departments, including the Sociology Department. (DX–8).

11. E. g., particular types of publications, participation in curriculum revision, etc.

the Sociology Department as of the date of Dr. Scott's non-renewal. As plaintiff stresses, no indication of the relative importance of the three criteria was provided in that statement and, in practice each member of the department was permitted to utilize his own personal view of the importance to the department of accomplishment in each area.[12] (Scarpitti, F–128). This makes objective analysis and review of a particular decision difficult and thus provides greater opportunity for the undisclosed operation of racial bias or stereotypes. This effect is ameliorated to a degree, however, by the requirements that each departmental member articulate to his colleagues the reasons for his vote on a candidate and that a statement of reasons be supplied to the candidate.

The departmental statements as well as the testimony of the department chairpersons provide enlightenment on the practical application of the "Master's Degree (or its equivalent)" and "Ph.D. (or its equivalent)" requirements. The concept of "equivalent" encompasses at least three distinct categories of candidates: the ABD who is on the verge of receiving a doctorate, the recipient of whatever the terminal degree is in the field where a Ph.D. is not offered, and the person who has significant prior experience in the areas of teaching, scholarship, or service which is deemed to make him or her as valuable to the department as one with the requisite degree of formal academic training. The chairpersons' testimony also indicated that, despite the declarations of the Handbook, a number of Departments had positions which they felt did not require a Ph.D. holder, or, in some instances even a Master's degree holder, and made their appointments accordingly.

Overall, in the 1976–7 school year, the University employed 13 Professors, 24 Associate Professors and 65 Assistant Professors with Master's degrees, and one Professor, one Associate Professor and three Assistant Professors with Bachelor degrees. (PX–71). While the testimony indicates that some of these 107 non-Ph.D. professors, who represented 15.7% of those serving in positions requiring a "Ph.D. or its equivalent", were hired at a time when the Ph.D. requirement was less emphasized than at present,[13] many are recent hires who either were deemed to have experience equivalent to a Ph.D.[14] or who were placed in positions which the department felt did not require a Ph.D.[15]

## 2. The procedure.

When there is a vacancy to be filled from the outside, the department forms a Search Committee and prepares a position announcement or job description. The position announcement is then submitted to the Affirmative Action Office for a decision on whether it contains qualifications which are unnecessary or have a discriminatory effect. If the document is approved, the depart-

12. At the time of trial the weights had been established for the criteria. (Scarpitti, F–127).

13. On a University-wide basis, the emphasis on doctorates does not appear to have materially increased in recent years, however. The 1976–7 Ph.D.-Masters mix was 73%–27%, while the 1971–72 ratio was 74%–26%.

14. Examples in this category include James Sills, a black Assistant Professor of Urban Affairs with a Master's degree, Edmund Glenn, a Professor of Communication with a Bachelor's degree, Nancy King in the Theater Department, Associate Professor Teter in Civil Engineering, Assistant Professor Eleanor Craig in Economics, Professor Earl in Computer Science, Associate Professors Molyneux and Ruark in English. Several department chairmen explained that the absence of a degree could be overcome by prior distinguished service in one's field. E.

g., Bray, J–26; Lee K–30; Salsbury, K–76; Donnelley, J–60; Vinson, K–99; Salisbury L–16; Warter, L–78.

15. Seven of eight Home Economics Assistant Professors have only Master's Degrees. (Bieber, J–125). The Allied Health Professions Unit, which trains students in medical technology and physical therapy, has no Ph.D.'s, and some Bachelor's on its faculty. (Clark, J–136; Lurie, K–15). In the Physical Education Department, of 34 faculty, only seven speciality positions require that Ph.D. The other positions are filled by Master's and Bachelor's recipients. (Brown, K–46). The Chairman of the Animal Science Department indicated that a Master's candidate would be considered for a specialized position. (Salsbury, L–16).

ment is given permission to advertise and is advised of the remaining requirements of the Affirmative Action Program. All advertisements must contain a statement, and all recruiting sources must be advised, that the University is an equal opportunity, affirmative action employer. (PX–45A). A list of contacts likely to reach black applicants, e. g. predominantly black schools, minority publications, and black caucuses of various professional associations, is provided to the department. The department is further advised to retain all of its records with respect to its search. (Turner, G–132–134).

The Search Committee reviews the written resumes submitted in response to its solicitations. These resumes do not ordinarily reveal the race of a candidate. The field is narrowed based on the training and experience reflected in the resumes. Thereafter candidates are invited to the campus to confer and, in some instances, to make a presentation. The Committee, or in some instances the entire department, then makes a recommendation for the position. No offer, written or oral, can be made without a submission of all recruitment data, including all resumes, to the Affirmative Action Coordinator along with an "Affirmative Action/Organizational Sign-Off Form" which summarizes the credentials of the candidate recommended, the number of applicants known to have been a member of a minority group or female, the recruiting efforts made, and the reasons for preferring the recommended candidate over any other applicant known to be a member of a minority group or female.[16] The Affirmative Action Coordinator, after reviewing the procedure used and the candidates considered can approve the recommended choice or veto it. If it is approved, the Sign-Off Form is signed by the Coordinator and filed in his or her office. (Turner, G–136–137). Ultimately, approval of new appointments must come from the Provost and the President.

Since 1974, the Affirmative Action Office has required departments to send out an "Applicant Supplemental Form" (DX–59) to each applicant for an academic position. The form, which is returnable to the Affirmative Action Office, guarantees anonymity and asks the applicant to indicate his or her racial/ethnic background, age and sex. The returns are utilized by that office in monitoring the hiring process.

The testimony of the Coordinator and the department chairpersons convinces me that the provisions of the Affirmative Action Program are, in fact, followed in the recruiting and hiring process and, in particular, that the recommended recruitment sources are contacted on a regular basis.[17]

While procedures for renewal, promotion and conferral of tenure vary from department to department, most follow a similar pattern. Each year the department chairperson evaluates each faculty member's teaching, scholarship and service and fills out a Faculty Appraisal Form. Review for purposes of recommendation for contract renewal, promotion or tenure can be requested by anyone in the department including the potential candidate himself. In some instances there are established times for review as, for example, at the end of the second year of a three year term. The candidate prepares a dossier and a review is conducted by the members of the department or some segment thereof. After a departmental recommendation there are subsequent reviews at the college and university levels. Final decisions are made by the President subject to confirmation by the Board of Trustees. (Kraft, I–61–64).[18]

---

16. DX–91, 98, 105–448.

17. Scarpitti, F–14; Rees, H–94; Chesson, I–28; Borden, I–75; Wetlaufer, I–95; Marks, J–4; Smith, J–54; Bieber, J–121; Clark, J–130; Gaither, K–39; Brown, K–48; Salsbury K–79; Leathrum, K–92–93; Salisbury, L–9; Exline, L–32–33; Homer, L–45; Markell, L–53; Mosberg, L–65.

18. Apparently, approval of promotions, renewals and conferrals of tenure by the Affirmative Action Office is not required. Mr. Turner did testify, however, that his office "monitors" the process "to make sure . . . [blacks] are given the same kind of opportunity for promotion as other faculty members are." (B–38).

D. *The Market For Black Academics.*

The University recruits nationally. All of the witnesses agreed that the national market for black academics is presently, and since Executive Order 11246 and the birth of affirmative action plans has been, a seller's market. (Blackwell, C–107; Lee, D–66). There are somewhere in the neighborhood of 2,000 colleges and universities in the country. (Blackwell, C–110; Lee, D–64). While the number of blacks with graduate degrees is the subject of some debate, one respected source reports that, exclusive of doctorates in Education, only 236 blacks earned their Ph.D.'s in 1973, 325 in 1974, and 387 in 1975. This averages out to about one-half of one black Ph.D., exclusive of education, for each college or university in the country during the three year period from 1973–1975. (DX–46). In some disciplines the total number of blacks holding a Ph.D. degree, including both new and existing degrees, is quite small. It was estimated, for example, that there are only somewhere between 250 and 300 black Ph.D. Sociologists in the country. (Blackwell, C–106, Lee, D–63).

The percentage of those with graduate degrees who are black remained relatively constant between 1965 and 1975. Recently, however, the situation has begun to improve. In 1977 blacks comprised 6.4% of all graduate school students. That is an increase from 5.2% in the previous year. (Blackwell, C–42).

The excess of demand over supply results in black academics receiving competing offers from a number of institutions and, in many instances, higher salaries to blacks than to whites with similar experience and credentials. (Brown, G–41; Warter, L–83; Siskin, O–48). Professor Scott, for example, had two dozen institutions interested in him when he was hired by the University of Delaware (Scott, B–146) and, as earlier noted, the University had to offer him $3,000 over its prevailing rate for Ph.D.'s in order to get him. (Scarpitti, F–40). All of the experts confirmed that this was a common situation.

Thus, black academics typically have a number of alternatives open to them and a college or university cannot expect to hire black faculty members simply by being open to that possibility. An institution must be active and competitive in order to attract black faculty members. One of plaintiff's witnesses put it this way:

> . . . It seems to me what happens in most cases is, the average black Ph.D. or person who is specializing in a given field, has a choice of many opportunities, and he normally does not have to seek out the University of Delaware or any other college for a job opportunity. But tendencies are, he may be more apt to be recruited than he is to go out and seek a job. . . . I think it is important to recognize the realities, because there are so few blacks. Those who are available and who are qualified tend to have people recruiting them, and I don't know of anybody specifically who has applied for a job at the University of Delaware and was denied a job opportunity because of their race. But I do think that most universities that are enlightened, have a policy in trying to improve their educational system, and provide an opportunity for their students to be exposed to all races and creeds and truly represent a universal kind of educational opportunity.

(Williams, A–127–28).

While there are varying estimates in evidence, I accept the figures of plaintiff's expert, Dr. Siskin, as being reasonable estimates of the available labor pool. Dr. Siskin estimated that of the national pool of Ph.D.'s in disciplines which are taught at the University, weighted to reflect the actual distribution of Ph.D.'s at the University among those disciplines, would have a black participation of approximately 2%. A similar pool of people holding Master's degrees in the relevant disciplines would have about a 4% black participation. Utilizing the 1976–77 Ph.D.-Masters mix at the University, 73%–27%, Dr. Siskin estimated that the available labor pool was 2.55% black.

Between September of 1974 and February 1 of 1977, 5,171 responses on the Applicant Supplemental Form were received by the Affirmative Action Office. This represented a 75% response rate.[19] The black portion of responding job applicants constituted 1.56% in 1974–5, 1.83% in 1975–6, and 2.38% for a portion of the 1976–7 school year. (DX–60–A, 60–B, 60–C). The percentage of responses by black applicants over the entire period was 1.78%.

## E.  The Black Perception Of The University.

While some evidence suggests that the situation has been improving in recent years, it seems clear that the University has not been viewed by the black academic community as offering an hospitable environment. Isolating the reasons for the reputation of an institution is more difficult than recognizing the existence of that reputation and its general character, but the record in this case does suggest some of the sources of the University's negative image in the black academic community.

Part of the problem relates to location. The University is situated in a small community and, as one of plaintiff's witnesses put it, there is no "indigenous black population near the campus."[20] Part of the problem relates to what is perceived to be the philosophical orientation of the University and its administration. In short, the University is viewed as an "ultra-conservative" institution.[21]

It also appears that the University is perceived by many to be generally "indifferent" or "insensitive" to blacks and their problems. This perception seems to stem from three things: (1) the segregated history of the University and the fact that most steps toward integration were compelled by external forces, (2) an unfortunate and well publicized episode in the spring of 1970 involving the failure to secure the services of a black anthropologist, Jennetta Cole, and (3) the inability of the University to hire more black faculty members than it has.[22] The impact of the University's history in race relations is understandable without further explanation. The second and third factors warrant further comment, however.

Information and impressions circulate efficiently in the relatively small community of black academics and the experience of individual black academics at a particular institution tends to affect its image throughout that community. Such was the case with Jennetta Cole. Professor Cole was recruited by the University for the position of Director of the Department of Black Studies in 1970. During her visit to the campus she was enthusiastically received by both students and faculty. She was offered an Associate Professorship and asked to serve as Director of the Department. Professor Cole was married to a white economist, however, and would not come to the University unless he were offered an Associate Professorship by the Economics Department. The Economics Department was willing to create an Assistant Professor position for him, but took the position that he had insufficient research and writing experience to merit Associate Professor status. The University Provost undertook to persuade the Economics faculty to change its position but Dr. Cole was forced to act on an outstanding offer from the University of Massachusetts while this debate was going on and she accepted the position there. The failure to move quickly in making an offer to Dr. Cole was perceived on the campus as "foot dragging" and as an indication that the administration did not really want to have Dr. Cole on the faculty. As a result, 42 black students staged a demonstration on Honors Day. (Scarpitti, F–27–32).

19.  There were 1,705 who failed to respond.

20.  Newton, A–160.

21.  Newton, A–151.

22.  *See* Section 1F, *infra.*

The inability of the University to hire more blacks than it has is significant for two reasons. First, it suggests to some blacks the idea that the University is "not really trying" to attract black faculty and, therefore, is not concerned about overcoming the effects of past discrimination. In addition, however, the most important effect of the University's performance in black hiring is that black academics, regardless of any image they may have of the attitude of the administration and faculty, are reluctant to join a community in which there are very few other blacks. Plaintiff's experts, as well as other witnesses, testified that an institution must achieve a minimum "critical mass" of blacks in its faculty community before it can expect to become an attractive environment for the majority of potential black faculty members. (Blackwell, C–30). The absence of such a "critical mass" fosters concern on the part of black academics about possible isolation and tends to encourage their pursuit of other available opportunities. Thus, institutions attempting to move from an all white or a virtually all white faculty to one representative of the national academic community face a difficult task until they reach the "critical mass" point and may find it necessary to offer extraordinary monetary or other inducements in order to reach that goal.

### F. The University's Experience With The Hiring Of Full Time Faculty.

Plaintiff's evidence shows the following participation of blacks on the University of Delaware full time faculty during the thirteen year period from 1964-65 to 1976-77.[23]

### TABLE 1[24]

| YEAR | FULL TIME TOTAL FACULTY | FULL TIME BLACK FACULTY | % BLACK |
|---|---|---|---|
| 1964–65 | 323 | 0 | 0.0 |
| 1965–66 | 342 | 1 | 0.3 |
| 1966–67 | 381 | 2 | 0.5 |
| 1967–68 | 438 | 1 | 0.2 |
| 1968–69 | 498 | 2 | 0.4 |
| 1969–70 | 542 | 3 | 0.5 |
| 1970–71 | 616 | 4 | 0.6 |
| 1971–72 | 646 | 8 | 1.2 |
| 1972–73 | 683 | 15 | 2.2 |
| 1973–74 | 714 | 13 | 1.8 |
| 1974–75 | 753 | 12 [25] | 1.6 |
| 1975–76 | 765 | 13 [25] | 1.7 |
| 1976–77 | 818 | 12 | 1.5 |

Plaintiff's evidence (PX–66) also shows the number of black hires to full time faculty positions for each year during the same period:

### TABLE 2

| YEAR | # |
|---|---|
| 1964–65 | 0 |
| 1965–66 | 1 |
| 1966–67 | 1 |
| 1967–68 | 0 |
| 1968–69 | 1 |
| 1969–70 | 1 |
| 1970–71 | 1 |
| 1971–72 | 6 |
| 1972–73 | 8 |
| 1973–74 | 2 |
| 1974–75 | 3 [26] |
| 1975–76 | 3 |
| 1976–77 | 0 |

Unfortunately, neither the plaintiff's nor the defendants' evidence gives a wholly reliable figure for the total number of full time faculty hires during this period or any portion thereof.[27]

---

**23.** There is insufficient information in the record regarding part-time faculty to permit reasoned inference. The Affirmative Action Coordinator testified that he was aware of no part-time availability statistics. (Turner, P-50).

**24.** Source: PX–66, PX–71. Plaintiff's Opening Brief, p. 9.

**25.** PX–66 lists both Mary Farrell and Eugene Eubanks as faculty members from 1969-1976. However, it appears that both left in 1974. See DX–471B and DX–471C. Farrell testified that she left in 1974 (Farrell, A-136), as did Dr. Bohner (H–38). Dr. Marks testified that Eubanks left in 1974. (Marks, J 7). DX–97, Eu-

banks' letter of resignation, dated April 1, 1974, also supports this. PX–66 does not list Dr. William Campfield as a full time faculty member. However, Dr. Markell, Chairman of the Accounting Department, testified that Dr. Accounting Department, testified that Dr. Campfield, who is black, was a visiting professor in that department for one year. (Markell, L–55). DX–471C confirms that Dr. Campfield was a visiting professor for the 1974–5 year.

**26.** PX–66 did not include Dr. Campfield.

**27.** After specifically disavowing an intention to offer such data under circumstances leading plaintiff reasonably to rely on that representa-

Between 1965 and 1970 there were only four black full time members of the University faculty. One of these was Dr. LeRoy Allen, a former President of Cheyney State College, who was brought into the Education Department as a full professor with tenure in 1968.

Between September of 1970 and the 1976–77 school year, various departments succeeded in bringing 23 blacks to the campus as full time faculty members or visiting professors. (PX–66). These men and women served in Education, English, Home Economics, Sociology, Black Studies, Secretarial Studies, Art, Physical Education, Nursing, Theater, Music, Life and Health Science and Accounting. (PX–66).

The record indicates that during the 1970 to 1977 period an additional 24 blacks either refused an offer of employment by a University Department as a full time faculty member or withdrew their applications while the University remained interested in them and was negotiating. At least four of this number declined two-different offers or invitations.[28] The Departments involved were Black Studies, Sociology, English, Theater, Chemical Engineering, Political Science, Mathematics, Home Economics, Biological Sciences, Music, Physical Education, Mechanical and Aerospace Engineering, Psychology, Accounting, and Business Administration. A review of a few of these situations will give an idea of the efforts that were made and the problems encountered.

Dr. Newton, who is head of the Black Studies Department and is himself black, testified that his top three choices for an Assistant Professor opening in 1975 or 1976 were black. One refused the offer and remained at predominantly black Howard University. Another required $20,000 and Associate or full Professor status. The third chose to go to another institution at the last minute. (Newton, A–176).

The Sociology Department, in approximately 1974, attempted to interest Prof. Edward Driver at the University of Massachusetts in coming to Delaware to succeed Dr. Scarpitti as Chairman of the Department. Professor Driver indicated it would require a salary of $32,000 to interest him. This was above the level that the Department had been paying its chairman so it asked the University President and Provost whether negotiations should be terminated. The recruiters were told that the salary demand need not be a bar. Professor Driver ultimately decided to stay at Massachusetts, however. (Harlan, H–11, 12).

On three occasions, departments managed to get blacks to campus as visiting professors and then attempted unsuccessfully to talk them into staying.[29]

In 1971, the Political Science Department voted unanimously to hire Raymond Hall. (DX–61). He had been sought out through personal contact. Initially, he accepted the offer (DX–63) but later indicated that he would be unable to come that year. (Ingersoll, J–34; Boyer, L–15–25). The offer was then renewed for the following year. (DX–71). When Hall did not respond promptly to the renewed offer, the Department increased the amount of the offer. Hall went to Dartmouth, however.

Efforts have also been made to find blacks in industry. The Chemical Engineering Department recruited a black Ph.D. employed by the Mobil Oil Company, had him to the campus for an interview, and expressed interest in his joining the Department. He decided to remain in industry, however. (Metzner, K–120).

tion, the defendant tendered such evidence at the end of the third week of trial. It was excluded for the reasons articulated by the Court at M–34–5 and N–89–90. *See also* M–2–9, M–29–34, L–2–6. The proffered evidence, the accuracy of which plaintiff challenges, tended to show that from the 1971–72 school year to the 1974–75 school year, 369 new people were hired as Instructors, Assistant Professors, Associate Professors and Professors, of whom 17 or 4.6% were black. (N–92).

28. Michael Gates (Hansen, H–133), Melvin Ramey (Chesson, I–28), Raymond Hall (Boyer, L–15–25; Ingersoll, J–34), and Robert Eubanks (Chesson, I–28; Vinson, K–100).

29. Dr. Campfield, Accounting (Markell, L–55); R. Eubanks, Civil Engineering (Chesson, I–28) and Mechanical and Aerospace Engineering (Vinson, K–100).

In 1974, the Department of Business Administration offered Dr. Jessie Colson a position as Chairperson of the Department of Secretarial Services with tenure. (DX–76). Dr. Colson initially accepted but was later relieved of her contractual obligation at her request. (Norman, L–88–96).

At the time of the last opening in the Physical Education Department, two qualified black candidates withdrew themselves from consideration when advised of the salary. (Brown, K–49; DX–394). A third, Raymond Ricketts, was offered the position and accepted it. (Brown, K–49). A short time later, however, he was released from his contract when he received a $1,000 higher offer from a university which he considered to have a more prestigious basketball program. (Brown, K–49; DX–394).

On two occasions, in 1972 and 1974, the Home Economics Department made offers to black candidates. First, Linda Jolly was offered a position (Bieber, J–116; DX–99), but turned it down (DX–100). Two years later, an offer was made to Lily Glover (Bieber, J–120; DX–103), who also refused it. (DX–104).

The Music Department made an offer to Glenn Gore, who turned it down for what he thought was a more desirable position (Lee, K–32). There have been similar experiences in the Departments of Biological Sciences (Clark, J–132–33), Psychology (Exline, L–32), Civil Engineering (Chesson, I–28), and Urban Affairs (Brown, G–39).

These experiences indicate that substantial efforts were made by many departments during the 70's to actively recruit blacks for full time faculty positions. They do not suggest that all of these efforts came without some prodding from the administration. President Trabant told the College of Marine Studies at one point that he would not approve any contracts for the Department, employment or otherwise, until they hired a black. (Trabant, N–48). He also threatened to disapprove all employment contracts of the Physical Education Department until it hired a black. (Trabant, N–49).

In 1975, the University established "Affirmative Action Goals and Timetables" for the hiring of blacks and females to faculty positions for the five year period from 1975 to 1980. (PX–45B). It was projected that there would be 206 hiring opportunities, of which 27, or 13.1%, would go to blacks. (Turner, P–3–4). PX–45B also indicates the goals and timetables for each year:

TABLE 3

| YEAR | PROJECTED HIRING OPPORTUNITIES | BLACK GOAL |
|------|------|------|
| 1975–76 | 59 | 3 [30] |
| 1976–77 | 41 | 6 |
| 1977–78 | 38 | 6 |
| 1978–79 | 36 | 2 |
| 1979–80 | 32 | 13 |

During the 1975–76 school year and prior to trial in April of 1977, three blacks were hired in full time faculty positions, two on a permanent basis and one as a visiting professor.[31] (Turner, P–34–35; PX–66).

**G. The University's Experience With The Renewal, Promotion And Tenure Of Black Full Time Faculty.**

The only evidence of a failure to renew a black full time faculty member is evidence pertaining to Dr. Scott's non-renewal.

The record is virtually devoid of data on black promotions and promotion eligibility, per se. We do know, however, that when the EEOC conducted its investigation in 1975, three of the fifteen blacks then on the faculty had become eligible for promotion, in the EEOC's view, during the preceding three years and two of them had been promoted. (PX–56, p. 5). The data on black participation in conferrals of tenure is somewhat fuller. In 1976, there were 314 tenured faculty members at the University, only two of whom (Professors Allen and

---

**30.** The Goals and Timetables were not completed until December of 1975. (Turner, P–5).

**31.** The record does not indicate the actual number of hiring opportunities which occurred during this period.

Newton) were black. Thus, only .6% of the tenured faculty was black. This figure can only be evaluated, however, with reference to the number and experience of black faculty theretofore employed by the University.

Since 1965, the University has hired 27 full time black faculty members,[32] three of whom were visiting professors. Of those 27, only two had been tenured at the time of trial. What follows is an analysis of the career patterns at the University of the 26 black faculty members other than Dr. Scott.

Dr. LeRoy Allen, the former President of Bluefield State College and Cheyney State College (Newton, A–148), was hired in 1968 as a Professor of Education. He was hired with tenure. He has remained at the University from 1968 to the present.

In 1972, Dr. James E. Newton was hired as an Assistant Professor[33] in Education. (Newton, A–143). In 1974, he resigned that post to become the Director of the Department of Black Studies. (Marks, J–15). He was an Associate Professor in the Black Studies Department. After a total of three years at the University, spent in two different departments, Newton was granted tenure in 1975. (Newton, A–149).

Dr. Gloria Hull was hired as an Assistant Professor in the English Department in 1971. (Bohner, H–41). At the time of trial, in 1977, she had qualified for and been nominated for promotion to Associate Professor with Tenure.[34] (Bohner, H–41).

This nomination had been approved by the Provost, and remained only to be approved by the Board of Trustees. (Bohner, H–41).

James H. Sills, Jr. was hired as an Assistant Professor in Urban Affairs in 1971. (Sills, E–3). When he was hired, he had the degree of Master of Social Work. (Sills, E–24). Despite not having yet received his Ph.D.,[35] he expected to be eligible for promotion in 1977. (Sills, E–26). This was due, in large part, to field experience he had in lieu of a Ph.D. (Sills, E–25, E–3–4).

Other than these four professors,[36] no black faculty member ever hired at the University had remained on the faculty for more than three years and also held a Ph.D., the normal minimum criteria for promotion to a tenured position.[37] As will be shown below, most of the other black faculty did not stay at the University for a sufficient period of time, or were otherwise unqualified, to be promoted to tenured positions. However, the record also indicates that those faculty members who left the University did so voluntarily for their own reasons, and not because the University refused to retain them.

Dr. Hilda Davis was a lecturer in the English Department from 1965 until 1970 when she retired at the age of sixty-five. (Bohner, H–37). Her degree was in Sociology and she taught primarily in the Writing Center, a branch of the English Department which provides remedial service on a tutorial basis. (Bohner, H–37, 38, 67).

---

32. In addition to the 26 full time black faculty members listed on PX–66, Dr. Markell, Chairman of the Accounting Department, testified that Dr. William Campfield, who was black, was a visiting professor in that department for one year. DX–471C lists Dr. Campfield as a visiting professor for the 1974–5 year.

33. PX–66 lists him as an Associate Professor. However, he testified that he was an Assistant Professor. (Newton, A–143).

34. Hull was not nominated for promotion and tenure in her fifth year at the University, so she resubmitted her application in her sixth year and was nominated. (Bohner, H–68).

35. At the time of trial, he was working toward his Ph.D.

36. In 1974, Dr. Jessie Colson was offered a tenured position as Chairperson of the Department of Secretarial Sciences. (Norman, L–88; DX–76).

37. The record indicates that it was possible to be promoted to a tenured position after only three years service, although normally tenure was awarded after a longer period, in many cases, six years. No black faculty member had ever remained on the faculty for six years without being promoted to a tenured position. In addition, there is evidence that it is possible to be promoted to tenure without having a Ph.D. (e. g. Sills). However, this requires other "equivalent" experience, which there is no indication that any of the non-Ph.D.'s with more than three years service possessed. (Washington, Gregory, Miles and Farrow).

Mary V. Farrell, who held a Master's degree, was an Instructor in the English Department from 1969–1974. (Farrell, A–136). She left in 1974 to accept a position at Lincoln University because she felt she could make a greater contribution to black students there. (Bohner, H–38; Farrell, A–138). At the time she left, she had been recommended for promotion to Assistant Professor. (Farrell, A–138).[38]

Richard Morse was a joint appointee as an Assistant Professor in Sociology and Education in 1966. He left in 1967 to go to Stillman College, a small black school in Alabama. (Harlan, H–5; Scarpitti, F–18). The University subsequently tried to get him to return, without success. (Scarpitti, F–18). Dr. Eva Adams was an Associate Professor in Home Economics from 1970 to 1973. (Bieber, J–114). She then resigned to become the Chairperson of the Home Economics Department at Delaware State College. (Bieber, J–116, DX–101).

In 1971, Katherine Morgan was hired as an Assistant Professor in the English Department. (Bohner, H–39). She stayed for only one year, and then accepted a joint appointment from Swarthmore, Haverford and Bryn Mawr. (Bohner, H–40). Dr. Eugene Eubanks was hired as an Assistant Professor of Education in 1972. (Marks, J–4). He resigned after two years in 1974,[39] (Marks, J–7, DX–97), and went to the University of Missouri for higher pay. (Marks, J–14).

Dr. Wilfred David and Dr. Livinus Ukachi were both hired as Associate Professors in Black Studies in 1971. (Wilson, B–31, 37; PX–66). Ukachi left after one year and David after three. (PX–66). John Cook was hired as an Assistant Professor in the Art Department in 1972. (PX–66). He remained for only one year. Esther Washington was an instructor of Secretarial Studies from 1972 until the time of trial. (PX–66). Constance Smith was hired as an Associate Professor of Black Studies in 1972,

with only a Master's degree. (PX–66). She left after one year.

Linda Tue was an Instructor in the English Department from 1972 to 1975. (PX–66; Bohner, H–42). After three years, she decided not to go on for her Ph.D., (Bohner, H–42), and left the University. Theodore Gregory, who has only a Bachelor's degree, (Brown, K–47), was hired as an Instructor of Physical Education in 1972, where he remained at the time of trial. (PX–66). Elizabeth Miles, who also has only a Bachelor's degree, was hired as an Instructor of Physical Education in 1972. (PX–66). In 1975, she moved to the Theater Department, where she is an instructor of dance. (Hansen, H–127). Eliza Farrow has been an Assistant Professor of Nursing since 1973, and has a Master's degree. (PX–66; Wandelt, H–142).

Robert Eubanks was a visiting professor jointly in Civil Engineering and Mechanical and Aerospace Engineering in 1973–1974. (Chesson, I–28; Vinson, K–100). When the year ended, both departments offered Eubanks permanent employment, but he refused both offers. (Chesson, I–28; Vinson, K–101). He also turned down an offer of an Associate Deanship at the University. (Greenfield, M–44). Dr. William Campfield was a visiting professor in the Accounting Department for the 1974–5 year. (DX–471C). After that year, he was asked if he would consider staying at the University, but declined to do so. (Markell, L–55). George Walker was a visiting professor in the Music Department for the 1975–6 year. (Lee, K–27).

Dr. Thomas Curtis was hired as an Assistant Professor of Criminal Justice in 1974. (DX–66). Dr. Althea Williams was hired as an Assistant Professor in the Art Department at the same time. (Teis, K–109). Each remained at his or her respective position in their third year, at the time of trial.

---

38. Although PX–66 shows that she remained on the faculty until 1976, this is refuted by her testimony, as well as by DX–471B and DX–471C.

39. Although PX–66 shows that he remained in the faculty until 1976, this is refuted by the testimony by Dr. Marks and by DX–471B and DX–471C.

In 1975, Dr. Patricia DeLeon was hired as an Assistant Professor of Life and Health Sciences. (Clark, J–132). At the time of trial, she remained in that position for a second year. James Symmons, with a Master's degree in Fine Arts, was hired as an Assistant Professor in the Theater Department[40] in 1975. (Hansen, H–128). He remained at that position at the time of trial.

Thus, of the 26 full time black faculty at the University since 1965 other than Dr. Scott, four were tenured or close to tenure at the time of trial. One other had left after she had been recommended for promotion. Three were visiting professors who stayed for only one year. One retired after being on the faculty for five years. Two left after three years service; two left after two years service; and five left after only one year of service. There is no evidence that any of these nine black faculty members left other than voluntarily.

Of the ten non-tenured blacks on the faculty at the time of trial, two[41] were in their sixth year of service, three[42] were in their fifth year of service; one was in her fourth year; two were in their third year; and two were in their second year.

## II. THE DISPARATE TREATMENT CLAIM.

Relying primarily on *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), Dr. Scott asserts that because of his race he was denied an equal opportunity to qualify for a tenured faculty position at the University. In support of this contention he relies primarily upon evidence that other non-black professors were reevaluated for renewal in the third year of their initial contract and/or were renewed for additional periods and thus afforded greater opportunity to qualify for tenure.[43] In order to make the comparisons which plaintiff invites, further facts are necessary concerning Dr. Scott and several other faculty members.

### A. *Scott.*

Scott began his service at the University in September of 1971. As of that date, his experience included eight years of teaching at a Canadian university and three years as a part-time graduate teaching assistant at Penn State. (Scott, B–44–45). Scott acknowledges that at the time of the commencement of his service to the Sociology Department, he knew that teaching and scholarship were two of the three criteria considered in renewal and tenure decisions in the Sociology Department. (Scott, B–97; Scarpitti, F–21). He likewise acknowledges that he expected to be reviewed for possible renewal of his three year contract in the spring of 1973. (Scott, B–158). I am confident that Dr. Scott had learned at least shortly after his arrival on campus of the departmental emphasis on scholarly research and publication.[44]

**40.** PX–66 lists Symmons as being an Assistant Professor in Health and Black Studies. However, Dr. Hansen testified that he was on the Theater Department faculty.

**41.** Hull and Sills.

**42.** All three are instructors. Two, Gregory and Miles, have only Bachelor's degrees. The third, Washington, has a Master's degree.

**43.** Dr. Scott, as I understand it, does not maintain that he should have received tenure at the end of his initial three year term.

**44.** The record shows that this was communicated to him by his colleagues. For example, Dr. Finner testified:

Q Before the time came for the evaluation of Dr. Scott for renewal of his third year contract, had you spoken to him at all about the need for publication?

A Yes.

Q Describe to the Court what you said and when and how often.

A I can't remember when, and it certainly was not more than two or three times, but I remember, as he was finishing his first year going into his second year, I remember asking him what he was doing, if he had anything rolling, because I realized that evaluation was going to be coming up the following spring. So I did, you know, say, "You ought to get something going," or something like that.

Q Was it your impression at that time that perhaps he didn't have anything going?

A Yes it was. I did not get an impression that he had anything going.

In March of 1973 Dr. Scott was informed that he should complete his dossier for evaluation by April 16, 1973. (DX–16). On May 1, 1973, the Sociology Department faculty met. (Scarpitti, F–78). The faculty believed that there was inadequate evidence of research activity to be evaluated in the dossier, and Scott was asked to prepare an addendum regarding his scholarly achievements. (Scarpitti, F–80). On May 3, 1973, the faculty senior to Scott met and recommended a denial of renewal. (Scarpitti, F–82). On May 8, 1973, the full Sociology Department faculty met (PX–12), and voted against renewal 9 to 1, with 2 abstentions. (Scarpitti, F–85; PX–9). As a result, Scott's service to the University was terminated when his contract expired after the 1973–4 year.

On May 9, 1973, Chairman Scarpitti wrote to Scott notifying him of the Department's recommendation and setting forth the reasoning which lead to that recommendation. The letter stated in part:

   \*   \*   \*   It was the consensus of the department faculty that your performance in the areas of teaching and scholarship have been below the standard that we wish to maintain in the department. In the area of service we found your performance to be adequate, although here there was some mixed feeling. It is not the faculty's belief, however, that an adequate performance in the area of service is enough to compensate for perceived deficiencies in the areas of teaching and scholarship.

The letter then went on to comment on the perceived deficiencies in Scott's teaching effectiveness and scholarship. It spoke of persistent complaints by a large number of Dr. Scott's students about lack of preparation, class time wasted with extraneous discussion, and the inhibiting of expression of student opinion, etc. It also noted Scott's prior teaching experience and the faculty's view that he should have been able to demonstrate more teaching effectiveness than he had after ten years of teaching. On the subject of scholarship, the letter observed:

   The difficulty we perceive in your teaching is compounded by the faculty's belief that you do not show the necessary promise in research and publishing. Your scholarly activities in the two years you have been on our faculty have been very limited. Indeed, to this date, no specific research has been undertaken by you with the aim toward scholarly publication. Your plans for the future were found to be imprecise and generally inadequate.

(PX–9). The letter concluded with an offer by Scarpitti to do whatever he could to help Scott locate a new position.

In the fall of 1973, Scott underwent open heart surgery and was on sick leave for the entire first semester. (Scott, B–67). He returned to teach Introduction to Sociology and American Minorities in the spring of 1974. He left the University upon the expiration of his contract on August 31, 1974.

It is clear from the record that from September of 1971 until the time of his evaluation for contract renewal, Scott had undertaken very little in the way of research and had produced nothing by way of scholarly publication. Moreover, he had nothing of substance underway or planned [45] at the time of the May 1973

---

Q  And your suggestion to him was what?
A  That this was a very important area to be concerned with in the department.
(F–187).

**45.** The only evidence of a publication by Scott between the time of his hire and May of 1973 was an article on the Canadian elections which appeared in the Wilmington Morning News on November 23, 1972. (Scott, B–99; PX–18). At that time, he was also working on a syllabus of reprints to be used along with an introductory sociology book for Warner Modular Publications. (Scott, B–164; Scarpitti, F–81; PX–18).

That syllabus was published in the latter part of 1973, although it does not appear to reflect substantial research on Scott's part. Scott also testified that he had been working on a paper for "Social Problems", a journal, which was not accepted for publication (Scott, B–99), and that his work for a local school district could possibly lead to later publications. (Scott, B–99). Dr. Scarpitti testified that there was "nothing of substance" in Scott's dossier in May of 1973, (Scarpitti, F–80), and it is clear that in terms of what the other members of the Department considered to be significant schol-

decision on renewal. These deficiencies weighed heavily against him in the minds of most of the Sociology faculty. (Finner, F–188, G–6; Brown, G–48; Eckhardt, G–76; Harlan, H–9; Dynes, H–24; McFarlane, DX–23, p. 14).

Dr. Scarpitti had evaluated Scott's effectiveness as a teacher on two occasions prior to the renewal evaluation, once on November 29, 1971, and once on November 14, 1972.[46] In 1971, Scott was assigned values of 4 on a scale of 10 for effectiveness as an undergraduate teacher and effectiveness as an undergraduate advisor. In 1972, values of 6 were assigned for those categories. While this was described as a "marked" improvement over the preceding year by the Chairman in his written comments, no member of the Sociology faculty received a lower grade in these categories in 1972. (Scarpitti, F–72, F–147).

During Scott's first year and the spring of his second, Chairman Scarpitti and other members of the faculty received numerous complaints from their advisees and other students of the kinds described in Scarpitti's letter.[47] There was also a Student Government Association course evaluation in the fall of 1971, which rated Scott's "Social Problems" course. (DX–18). In that student evaluation, only 29% of the class responded (35 of 120). 45.5% of those responding believed that the lectures contained mainly irrelevant materials. 55.9% believed that the course had not contributed to their growth or development. 70.5% felt Scott, as a teacher, was "below average" or a "bummer". Finally, 81.2% said they would not recommend Scott as a professor.

With respect to service activity, the Chairman's evaluation in 1972 acknowledges that he was engaging in a great deal of service activity both on and off the campus. Among other activities Scott served as Chairman of the Education Committee of the Wilmington Branch of the NAACP. (Scott, B–101).

### B. *Nohara.*

Dr. Shigeo Nohara, who is of Japanese descent, was hired as an Assistant Professor in the Sociology Department in 1965. (PX–17). At that time, the Department was dedicated to teaching and there was no requirement of scholarship or service. (Scarpitti, F–95). Nohara was given a three year contract in 1965. During this period he carried a 12 hour load of undergraduate teaching. In the spring of 1967, he was renewed for a second three year term. (Scarpitti, F–149). After his renewal in the fall of 1967, the previously described change in the policy of the department began. (Scarpitti, F–97, F–150). Even after 1967, however, Nohara had a heavy teaching load which was not lessened until the fall of 1969. (Scarpitti, F–152). When the time came for another decision on Nohara's faculty status, in April of 1970, he was given a new two year contract to permit him to work on a substantial research project which he had underway at the time. (DX–455). When his scholarship record did not improve significantly during the additional two years, Nohara was terminated. (Scarpitti, F–97; DX–456).

### C. *Black.*

William Black, a white, was hired as an Instructor in the English Department in 1968. (PX–28). He was renewed at that position in 1969 and 1970. (PX–28; Sanchez, A–25). In 1971, after he received his doctorate degree, he was promoted to As-

---

arship, this was an accurate statement. Scott reviewed the book *Death of White Sociology*, and his review was accepted for publication sometime in 1974 by the Journal of Marriage and the Family.

**46.** PX–11 and 12.

**47.** Dr. Scarpitti testified that he received twelve to fifteen such complaints. (Scarpitti, F–133, F–62–66; see also DX–14). Similar complaints were received by other faculty members. (Brown, G–50; Eckhardt, G–77; Wenger, G–113; Harlan, H–8; McFarlane, DX–23, p. 14). There is also record evidence from students demonstrating dissatisfaction with his teaching performance. (Dykes, G–84). There is also evidence indicating that the enrollment in Scott's "American Minorities" course fell from 85 to 5 over the three years Scott taught at the University. (Scarpitti, F–90).

sistant Professor on a three-year contract. (Bohner, H–55). The record shows that Black was highly regarded as a teacher. (Sanchez, A–24; Bohner, H–60). However, his scholarship record lacked quality. (Bohner, H–59). When he came up for renewal as an Assistant Professor, he was automatically renewed by the senior faculty members under then existing rules of the English Department. (Bohner, H–56). This renewal was vetoed by University officials, however, because he had already been on the faculty for six years. (Bohner, H–58). Black was then given a one year contract. (Bohner, H–58; PX–30). When he showed no improvement in scholarship during that year he was given a terminal contract. (Sanchez, A–25; PX–32; Bohner, H–59).

### D. Reddington.

Dr. John Reddington, who is white, was hired in the English Department in 1965 or 1966 on a three year contract. (Bohner, H–60). Under the English Department policy noted above, he was automatically renewed for a second three year term. When his research activity did not prove satisfactory in reviews in both his fifth and sixth years (Bohner, H–78), Reddington was terminated. (Bohner, H–60; Sanchez, A–23).

### E. Kepka.

Dr. E. J. Kepka, who is white, was hired as an Assistant Professor of Educational Foundations in 1971. (PX–27; Mosberg, L–74). He was evaluated in his second year and not renewed because of a poor teaching record and his lack of research. (Mosberg, L–74). In his third year, when he showed little improvement, he was again denied renewal. (Mosberg, L–75). He was then given a terminal contract. He was later given a third opportunity for evaluation. (Mosberg, L–75). He declined that opportunity and resigned from the faculty. (Sanchez, A–24).

---

**48.** This is true whether the action arises under Title VII, 42 U.S.C. § 1981, or 42 U.S.C. § 1983. *See, e. g., McDonald v. Santa Fe Trail Transportation Co., supra,* which arose under both Title VII and Section 1981.

### F. Analysis.

The ultimate decision to be made in any racial discrimination case where the plaintiff makes a claim of disparate treatment is whether it is reasonable to infer from all the evidence that the challenged action was based in whole or in part upon race.[48] Hence, the question is whether the non-renewal of Scott's contract or the failure to reevaluate him in his third year was based in whole or in part on his race. If the non-racially based reasons advanced for these actions (or failure to act) were in fact what occasioned them, there is no basis for liability on the disparate treatment claim. If they were mere pretext, however, for a racially motivated decision, relief must be fashioned. *Furnco Construction Corporation v. Waters,* —— U.S. ——, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

This focus must be kept in mind in determining how much similarity between the situations of different faculty members make them "comparable" for purposes of applying the doctrine of *McDonald* and *McDonnell Douglas.* These cases speak of ways "to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." [49] The closer the situations of two employees of different races who are treated differently, the more compelling is the inference that race played a role in the disparate treatment. But the ultimate question is whether, drawing the reasonable inferences from all the evidence, it appears that the plaintiff was treated differently from other employees due to his race.

Based on all the evidence, I conclude that the failure of the University to renew Scott's contract resulted from the opinion of nine members of the Sociology Depart-

---

**49.** *Furnco Construction Corporation v. Waters,* —— U.S. at ——, 98 S.Ct. at 2949.

ment that he was not, and would not develop into, an acceptable permanent professional colleague. This opinion was based primarily on what they considered to be a demonstrated lack of interest in pursuing the kind of scholarship, research and writing which they thought to be significant, and secondarily, on the view that one with the teaching experience which Scott had should have developed greater effectiveness in relating with students. As far as the failure to reevaluate Dr. Scott at the end of his third year is concerned, I conclude that no evaluation took place because one was not requested and because the situation had not materially altered since the time of the evaluation at the end of his second year.

I base these conclusions on the testimony of the members of the Sociology Department and other evidence which tends to confirm the credibility of their testimony. Eight colleagues of Dr. Scott testified,[50] including six of the nine who voted not to renew his contract and one of the two who abstained. Each testified about his own contact with Dr. Scott and of his opinion regarding Scott's teaching, scholarship, and service. The uniform view, which I accept as an accurate reflection of the opinions which motivated the non-renewal decision, was that Scott was not the kind of "sociologist's sociologist" the department was looking for. He appeared to lack either the interest or discipline necessary to do the kind of research and publication that they were interested in and, indeed, Scott recognized this at the time. (Finner, F–188, G–6; Brown, G–48; Eckhardt, G–76; Harlan, H–9; Dynes, H–24; McFarlane, DX–23, p. 14). In February of 1973, for example, he told Professor James (who was then seeking a job at the University) that he did not feel his interests matched the University's and the Department's interests and that he did not perceive himself as writing the kind of scholarly journal articles that were required.[51] While some of Scott's colleagues felt that his teaching had improved during his stay at the University, they believed it was substantially below what should be expected for the amount of his experience. (Brown, G–48; Harlan, H–8). Finally, while they acknowledged Scott's interest in community service, some considered the service concept to relate solely to making one's professional skills available to the community and did not feel that Scott was serving the community in the capacity of a sociologist.[52] (Brown, G–73; McFarlane, DX–23, pp. 40–41).

This testimony of Scott's colleagues is consistent with the other evidence concerning Scott, and the Sociology Department and its members. The record shows, for

---

50. Scarpitti, Finner, Brown, Eckhardt, Wenger, Harlan, Dynes and McFarlane, by deposition. Professor James, a ninth colleague, also testified. However, he did not join the faculty until September of 1973, after the decision not to renew Scott had already been made. (James, G–102).

51. Dr. James testified:

Q Did you talk about what would be expected of you as an Assistant Professor at the University of Delaware if you were able to come?

A Yes, we did.

Q And what did Dr. Scott tell you?

A He indicated to me that the department and the University both, in his estimation, were very interested in scholarly publication of the type in our professional journals.

Q What else did he say?

A That promotion or retention would be impossible without that, and that he did not feel that his interests matched what the University's and the department's interests were.

That is, he did not perceive himself as writing the kind of scholarly journal articles that were required.

Q Did he perceive that as affecting his continued employment at the University?

A Yes, he did.

Q What did he say about that?

A He indicated that in his judgment it would be unlikely that he would be able to stay at the University of Delaware for too long, given the discrepancy between his interests in his work and the University's expectations.

Q Expectations with regard to scholarship and publication?

A Right.

(G–104–5).

52. The one faculty member who voted for a contract extension did so, not on the basis of past performance, but rather on the basis that Dr. Scott should be granted more time for improvement. (McFarlane, DX–23, pp. 36, 39).

example, that a number of these men had backgrounds in the civil rights movement and elsewhere which vouch for their concern about equal rights. (Scarpitti, F–25; Finner, F–181; Brown, G–31–32). Dr. Scarpitti, who was then providing the leadership of the Department, had demonstrated his concern in the race relations area in a number of concrete ways. When Scott was hired by a vote of the Department only two years earlier, in preference to two white candidates who were also considered qualified, we know that his race, as well as his extended prior teaching experience, weighed heavily in his favor. (Brown, G–49). When he arrived on campus, he was graciously received and thereafter continued to enjoy a social relationship with several members of the Department. (Scarpitti, F–48–50). It is also true, however, that Dr. Scott arrived at a time when a change in departmental philosophy was bringing very heavy emphasis to the area of scholarship. And, finally, we know that, whatever may be the accuracy of their evaluation, these men had received information supporting the views which they expressed regarding Scott's scholarship and teaching effectiveness.

Against this background, plaintiff's "comparative" evidence is unpersuasive. While it is true that Black, Reddington and Kepka were given significantly greater opportunities for reevaluation, there are rational explanations for this which are unrelated to race. The practices in the English Department and in the Department of Educational Foundations at the times of their renewals were simply different than the practice of the Sociology Department in 1973. There is nothing in the record to suggest that the differences in procedures between departments were somehow a mask for discrimination, and nothing in Title VII nor the Civil Rights Acts requires that all academic departments of a university operate in the same manner.

Nor do I find the evidence with respect to Dr. Nohara indicative of racial discrimination against Dr. Scott. Dr. Nohara was hired and initially renewed at a time when the Sociology Department's sole criteria for renewal was teaching. Even after this policy changed in 1967, Nohara had a very heavy teaching load until 1969, and could not reasonably be expected to embark upon any meaningful research. When he came up for another renewal decision in 1970, the faculty felt it would be unfair to hold him to the Department's new research and scholarship requirements, which he had not yet been given an opportunity to achieve. In addition, he had a major research project underway at that time. When, after two years, Nohara did not show adequate research achievement, he was terminated. Since Nohara had been hired under a renewal system far different from that Scott was hired under, and since he had a heavier teaching responsibility, a comparison between the two does not suggest that the failure to afford Scott the same opportunities for improvement was racially motivated.

There is still another reason why Scott was not similarly situated with the other four faculty members whom he cites and why his lack of opportunity for improvement and reevaluation do not indicate discriminatory treatment. At the time that Scott was hired at the University, he had been a full time faculty member at other institutions for eight years. There is no evidence that any of the other four faculty members had similar experience. In fact, it is clear that neither Black nor Nohara had any prior full time[53] teaching experience before they were hired by the University. (PX–17, PX–29). I cannot find disparate treatment when faculty members without any previous experience are given opportunities to improve their teaching and develop their research, which experienced faculty members are not afforded.[54]

---

**53.** Black had been a graduate teaching assistant at Duke University for two years.

**54.** Scott's brief emphasizes that he is the only Assistant Professor of Sociology since Scarpitti came to the campus in 1967 who was not renewed at the end of an initial three year

Besides the comparative evidence just discussed, plaintiff sets forth a list of miscellaneous supportive evidence indicating discrimination against Scott. I do not believe, however, that any of this evidence fairly leads to the conclusion that Scott was not renewed, or that he was not given an opportunity for improvement, for racial reasons. These pieces of evidence include the receipt by Scott of hate mail, some clearly racially motivated, (Scott, B–79; PX–14), a student complaint that Scott was seen lying drunk on the ground with a whiskey bottle in his hand, (Scott, B–85; DX–11, 12; PX–25), and a remark by Dr. DiRenzo of the Sociology Department at a 1971 faculty meeting referring to the hiring of Scott and using the words "window dressing".[55] (Scott, B–89; Scarpitti, F–52; Dynes, H–25; Sanchez, A–26). While some of this evidence is indicative of racial prejudice on the University campus, it does not suggest to me that Scott was a victim of racial discrimination by the University in its renewal process, or that he was treated differently than non-black faculty by the University.

Dr. Scott's disparate treatment claim is without merit.

## III. THE DISPARATE IMPACT CLAIM.

Plaintiff asserts on behalf of the class that the employment practices of the University have had, and continue to have, a disparate impact upon blacks in the areas of hiring, contract renewal, promotion and tenure. This Court is asked to declare these practices to be in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983. The relief which plaintiff seeks is an order requiring that one of every three new faculty hires at all

levels at the University (e. g. Assistant Professor, Associate Professor, etc.) shall be black until such time as blacks make up 12.5% of the total faculty.[56]

Plaintiff makes two arguments in support of his claim of disparate impact. First, it is said that the University's use of a doctoral degree criterion has a disparate impact upon blacks which is not justified by the legitimate needs of the University. Second it is argued that, even assuming the validity of this educational degree criterion, the decentralization and subjectiveness of the decisional process in the areas of hiring, renewal, and advancement have the overall effect of putting black candidates at a disadvantage.

The Supreme Court recently reviewed the controlling principles and the trial burdens in Title VII disparate impact cases in *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977):

[The] . . . cases make clear that to establish a prima facie case of discrimination, a plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Griggs v. Duke Power Co.,* supra, 401 U.S. 424 at 432 [91 S.Ct. 849, 28 L.Ed.2d 158]. If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship.'" *Albemarle Paper Co. v. Moody,* supra, 422 U.S. 405 at 425, [95 S.Ct. 2362, 45 L.Ed.2d

---

contract. Significantly, however, he does not compare his experience and credentials with any member of the Sociology Department, other than Nohara, who was renewed after three years. As indicated in the text, Nohara's case is not comparable to that of Scott.

55. DiRenzo abstained in the vote on Scott's renewal (Scarpitti, F–86; Scott, B–173). He also attempted to apologize to Scott for his remark. (Scott, B–169). The rest of the department faculty did so apologize. (DX–99).

56. No damages attributable to present or past effects of discrimination are sought.

280] quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801, [93 S.Ct. 1817, 36 L.Ed.2d 668].

■ In order for a plaintiff to prevail in a Section 1983 discrimination claim, there must be not only a discriminatory effect, but discriminatory intent on the part of the state officials as well. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Since I am not persuaded that any of the challenged practices have been instituted or maintained for the purpose of adversely affecting blacks, the plaintiff's claim under that section may be eliminated at the outset.

The question of whether Section 1981 also requires a showing of discriminatory intent is an open one.[57] *Richardson v. Pennsylvania Department of Health*, 561 F.2d 489, 493 (3rd Cir. 1977). For present purposes, however, I will assume that Section 1981, like Title VII, does not require discriminatory intent.

### A. *The Ph.D. Or Its Equivalent Criterion.*

■ A "Ph.D. degree (or its equivalent)" is a prerequisite for appointment or promotion to most of the Assistant Professor, Associate Professor and Professor positions at the University. It is clear that this requirement currently has a disparate impact upon blacks. The black percentage of those holding Ph.D. degrees in the disciplines taught at the University is substantially lower than the black percentage of those holding Master's degrees and Bachelor's degrees in those disciplines. Thus, if the University utilized an inflexible Ph.D. requirement, it would necessarily affect blacks adversely. While the University does utilize an equivalency concept, this modification does not eliminate the disparate impact. I reach this conclusion because the black percentage of those either holding Ph.D. degrees in the relevant disciplines or possessing the kind of experience which the University accepts as equivalent is also undoubtedly less than the black percentage of those holding Master's and Bachelor's degrees or the equivalent in those disciplines.[58]

The remaining questions are (1) whether the University has justified its degree requirement by showing that it has a "manifest relationship" to the responsibilities of a full time faculty member and, if so, (2) whether the plaintiff has shown that some other criterion or selection procedure with less of a disparate impact upon blacks would serve the University's legitimate interests as well.[59] *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

While the evidence on the question of justification is surprisingly sparse, it is fair to say that the record offers two rationales for the "Ph.D. or it equivalent" requirement. The first and foremost of these rationales is that the experience, knowledge

---

**57.** The Supreme Court has granted certiorari in a case which presents this issue. *Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977), *cert. granted* —— U.S. ——, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978).

**58.** I conclude that this showing of a disparity between the black participation in the qualified pool when the degree requirement is utilized and when it is not constitutes a prima facie case. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). *But see Townsend v. Nassau County Medical Center*,

558 F.2d 117 (2nd Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 759 (1978).

**59.** It is incumbent upon the plaintiff to at least identify an alternative selection procedure which he or she claims would have less of a disparate impact and would serve the employer's legitimate interest as well. *EEOC v. DuPont*, 445 F.Supp. 223, 264 (D.Del.1978); *Crockett v. Green*, 388 F.Supp. 912, 920 (E.D. Wis.1975), *aff'd* 534 F.2d 715 (7th Cir. 1976).

and skills acquired in obtaining a Ph.D. are reasonably related to the ability to do research, think creatively, and add to the existing fund of knowledge through publication and other communication in one's chosen field. This scholarship function is crucial to the University, it is said, because a "true university . . . [is] concerned with the discovery or creation of knowledge as well as its transmission through teaching and service."[60] Thus, in the words of Dr. Scarpitti, the University views itself as being "in the business of creating knowledge as well as in the business of disseminating knowledge."[61] Moreover, involvement in "the business of creating knowledge" is viewed not only as valuable in itself but also as a means of keeping a faculty member's teaching "alive and current".[62]

The second rationale is that the Ph.D. experience or its equivalent is reasonably related to an ability to teach graduate students, it being desirable for those teaching to have more extensive academic training than those being taught. This rationale is reflected in the Physical Education Department, for example, where there were twenty-four positions for Assistant, Associate and Full Professors in 1976–7, and only the seven positions which involved the teaching of graduate students had a Ph.D. degree requirement as a matter of Department practice. (Brown, K–53).

I do not understand the plaintiff or the EEOC[63] to maintain that a Ph.D. degree in a particular discipline is not highly correlated with, and predictive of, the ability to teach graduate students in that discipline. Nor do I understand either to say that a Ph.D. degree in a particular discipline is not highly correlated with, and predictive of, the ability to engage successfully in scholarly research and writing which will add to the fund of knowledge in that discipline.[64] Thus, this is not a case like *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where the court found that a high school diploma requirement had not been "shown to bear a demonstrable relationship to successful performance of" jobs in a power generating facility. 401 U.S. at 431, 91 S.Ct. at 853.

What I do understand the plaintiff and the EEOC to maintain, with support from the plaintiff's expert witness, is (1) that one doesn't need a Ph.D. or its equivalent to teach undergraduate students and the teaching of many, if not most, of the full time faculty members at the University is limited to undergraduates, and (2) that, even in the context of teaching graduate students or pursuing scholarly activities, some individuals have other kinds of experience which makes them as valuable as a Ph.D. holder. Accordingly, they contend that the Ph.D. requirement should not be applied to as many faculty positions as it is at the University and that even where the requirement is properly applied as a general rule, it should be flexible.

The suggestion that the Ph.D. or equivalent requirement be eliminated for teachers

---

60.  DX–52.

61.  Scarpitti, F–98.

62.  PX–88, p. 4–7.

63.  The EEOC filed a brief and submitted oral argument as an amicus curiae.

64.  Plaintiff does argue that relief should be awarded because the University has not "validated" the Ph.D. or equivalent requirement in accordance with 29 C.F.R. § 1607.1, *et seq.* The EEOC initially suggested at oral argument that such formal validation is not necessary in this context, but ultimately declined to take a position on the issue. While these regulations can be read to apply to a Ph.D. or equivalent requirement, the Supreme Court has interpreted them in a manner inconsistent with plaintiff's contention, *Griggs v. Duke Power Co., supra,* 401 U.S. at 433 n. 8, 91 S.Ct. 849, and courts considering challenges to objective educational job criteria have generally not required validation in the manner there required. *E. g., Boyd v. Ozark Air Lines, Inc.,* 568 F.2d 50 (8th Cir. 1977); *Spurlock v. United Airlines, Inc.,* 475 F.2d 216 (10th Cir. 1972); *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972); *League of United Latin American Citizens v. City of Santa Ana,* 410 F.Supp. 873 (C.D.Cal.1976). But, even if there be a requirement as to the character of the evidence necessary to demonstrate job relatedness in a case where that issue is seriously disputed, it would elevate form over substance to require empirical test data in a case where there is no such dispute.

of undergraduate students ignores a substantial part of the responsibility of a member of the University faculty. The University regards the expansion of knowledge as one of its primary missions and requires scholarship activity from virtually all of its faculty.[65] While plaintiff is critical of the emphasis currently being placed on scholarly research and publication by the University, the University's choice of mission is not a subject for judicial review. The purpose of Title VII is not to dictate what the function or business of an institution will be or what tasks and responsibilities its employees will undertake. Its sole purpose is to eliminate employment discrimination against the classes which it protects and what it precludes is hiring criteria which have a disparate impact on a protected class and which do not bear a demonstrable relationship to responsibilities of their position, whatever they may be.

Turning to plaintiff's suggestion regarding increased flexibility in the application of the degree requirement, it is, of course, true that one may succeed in scholarship and graduate teaching without a Ph.D. degree. But the record indicates that the University has recognized this fact in the formulation of its employment criteria by inclusion of the "equivalency" proviso. It demonstrates, as well, that full time faculty members are hired and retained at positions above the instructor level without having a Ph.D. degree. While plaintiff argues that

the University's application of its educational criterion is less flexible in practice than required by the legitimate University interest which supports it, this is difficult to reconcile with the record.[66] The evidence with respect to the application of the "equivalency" concept at the University of Delaware suggests that its practice does not differ materially from the practices at the University of Massachusetts[67] and Brooklyn College[68] which plaintiff's experts recommend as having the kind of flexible degree requirements which are desirable. The application of the equivalency concept at these institutions has produced full time faculties which have a 75% Ph.D. population.[69] This is slightly higher than the 73% Ph.D. population at the University of Delaware.[70]

In summary, while the "Ph.D. or its equivalent" requirement probably has a disparate impact upon blacks, I conclude (1) that this disparate impact is justified by the legitimate interest of the University in hiring and advancing persons who are likely to be successful in adding to the fund of knowledge in their chosen disciplines and effective in the teaching of graduate students in those disciplines, and (2) that plaintiff has suggested no alternative criterion or selection procedure which would serve that interest as well with less potential for adverse effect on blacks.

65. PX–88, Handbook For Faculty at p. 4–7. The University of Delaware is, of course, not alone in considering the expansion of knowledge as part of its function and scholarship as part of the responsibility of a faculty member. The record shows that most colleges and universities in the country use scholarship as one of the criteria for hiring, promotion and tenure. The record also shows that these institutions pay a significant premium for holders of Ph. D's. This would appear to reflect a general judgment in the academic community that there is a high correlation between receipt of a Ph.D. and the demands of a faculty position.

66. The evidence concerning the black segment of the faculty, for example, indicates that the degree requirements are applied with considerable flexibility. Two of the three black instructors on roll at the time of trial did not have Master's degrees and three out of the nine

blacks then holding higher ranks did not have their Ph.D. degrees. Thus, only six of the twelve black full time faculty members held Ph.D.'s.

67. Blackwell, C–90–93.

68. Lee, D–28–30.

69. See Blackwell, C–22; Lee, D–37.

70. Plaintiff's expert testified that nationally only 58% of all faculty members hold Ph.D. degrees. He also testified, however, that this figure reflects institutions which differ widely in mission from the University of Delaware. It includes community colleges, for example, and less than 10% of the new hires at such institutions hold Ph.D. degrees. (Blackwell, C–22–23).

## B. *Subjectivity And Decentralization In Hiring.*

### (1) *The Title VII claim.*

The provisions of Title VII were not applicable to the University until March 24, 1972, the effective date of the 1972 Amendments to that Act. Thus, as far as the Title VII discrimination in hiring claim is concerned, the task is to determine whether the hiring practices of the University have had a disparate impact at any time between March of 1972 and the present. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1976).[71]

I have found that at the time of trial there were twelve full time black faculty members out of a total full time faculty of 818. This represents 1.46%. I have also found that the appropriate hiring pool is approximately 2.55% black. Dr. Siskin testified that, given this pool, the probability of finding twelve or less blacks among a faculty of 818, if race were not a factor in the selection process, would be only 3%. This is statistically significant under the EEOC guidelines and the decisional law.[72] Alternatively, looking at this data in terms of the statistical analysis suggested by the Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), n. 17, given a pool which is 2.55% black, one would expect to find 20.86 blacks on a faculty of 818. This expected value is 8.86 higher than the observed value of twelve and the standard deviation is approximately 4.5. Thus, the observed value is about 1.97 standard deviations less than the expected value.[73]

This data provides a rational basis for an inference that the University's hiring process has a disparate impact upon blacks and plaintiff has, accordingly, established a prima facie case. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). The ultimate question as to whether the University's hiring practices adversely affect blacks, however, must be answered in light of all of the evidence, both statistical and non-statistical. *EEOC v. DuPont*, 445 F.Supp. 223 (D.Del. 1978).

There is other statistical data available which is helpful in determining the significance of the data comprising plaintiff's prima facie case. The relevant question is whether the University's post-Act hiring practices have adversely affected blacks. The record shows that the last elections with respect to a significant number of full time faculty positions were made at a time when different employment practices prevailed. Thus, for example, it is clear that a substantial segment of the 818 positions on the full time faculty in 1976–77 were last filled before 1965, thirteen years ago. The University's experience with filling these positions is of limited value in determining whether the University's current employment practice adversely affects blacks.[74] While the record does not disclose exactly how many of the 818 faculty members were hired prior to 1965, Dr. Siskin testified that there were 275 tenured faculty members in the 1975–76 school year and that 42%, or 115, of them had been hired prior to 1965. (Siskin, E–100). While some of these 115 may have retired and been replaced at the end of the 1975–76 school year, it is reasonable to expect that at least 100 of the 818 faculty members during the 1976–77 school year were hired in 1965 or before. If this segment of the sample (which included no

---

**71.** While not of controlling significance under the Court's view of the facts, the Title VII class should have been limited to those who could have filed a charge with the EEOC on September 21, 1973 (the date Scott filed his charge), that is, those who applied, or but for the discriminatory practices would have applied, within 180 days preceding September 21, 1973, i. e. after March of 1973. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3rd Cir.), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

**72.** 29 C.F.R. § 1607.5 recognizes anything under 5% as statistically significant.

**73.** A differential of 1.65 standard divisions in *Castaneda* terms is the equivalent of 5% in terms of the analysis reflected in 29 C.F.R. § 1607.5.

**74.** As noted earlier, the University hired its first full time black faculty member in 1965.

blacks) is eliminated and one assumes a total population of 718 faculty positions available, the expected value, using a 2.55% black pool, would be 18.3 black faculty members. This is less than one and one-half standard deviations above the observed value of 12.[75] This exclusion of an irrelevant portion of plaintiff's sample thus substantially weakens the inference which he seeks to draw.[76]

Moreover, plaintiff's prima facie statistical case involved static figures, as contrasted with what might be called hiring flow data which generally are of greater probative value in assessing disparate impact in hiring. While the record unfortunately does not contain complete hiring flow data, there are some helpful figures in this area. It will be recalled that an Affirmative Action Sign-Off Form approved by the Coordinator was a prerequisite to making an offer of full time employment. The forms filed during the four year period from 1973–4 to 1976–7 (DX–91, 98, 105–448) show a total of 303 formal offers for full time faculty positions. They also show that 6, or 1.98%, of those offers were made to and accepted by blacks. (DX–136, 145, 153, 154, 273, 444). Assuming an availability pool which was 2.55% black, one would expect to have 7.73 offers to blacks, rather than 6. Using the *Castaneda* formula, the observed value is less than 1 standard deviation less than the expected value.[77] This means that the available flow data on hiring offers does not provide a statistically significant indication of adverse impact.[78]

Finally, there is one other source of statistical data which I find to be significant, particularly when viewed in the light of the non-statistical evidence. The record indicates that approximately 75%[79] of the applicants for faculty positions from 1974 to sometime in the 1976–7 year returned "Applicant Supplemental Forms" (DX–59). These forms show that 1.78% of the applicants returning them indicated that they were black. While it would be desirable to have follow-up data which would confirm whether the 1.78% black applicant rate in the 75% sample is indicative of the entire sample, the absence of such follow-up data does not deprive the data of probative value. No reason was suggested by an expert why one would expect a higher proportion of black non-responses than non-black non-responses, and I can perceive none. These data suggest (a) that the percentage of blacks among those applying to the University for full time faculty employment is somewhat lower than the percentage of blacks in the available labor pool and (b) that the University's black hiring rate corresponds quite closely with the rate at which blacks are applying for such employment.

In summary, the limited applicant flow data and hiring flow data available do not support the inference of disparate impact on blacks. On the other hand, the static work force data cited by Dr. Siskin and the applicant supplemental form data do provide some support for Dr. Siskin's opinion that "there is something in the process of selecting new full time faculty which re-

**75.** Under the formula set out in *Castaneda v. Partida, supra,* the standard deviation is about 4.2.

**76.** Dr. Siskin testified that excluding 150 non-black faculty members from the population, the probability that race was not a factor in the selection process would be 9.9%, which is not significant under 29 C.F.R. § 1607.5. (Siskin, N–53).

**77.** Under the *Castaneda v. Partida* formula, the standard deviation is approximately 2.75. The observed value is 0.63 standard deviations less than the expected value.

**78.** *Castaneda v. Partida, supra,* 430 U.S. at 497, n. 17, 97 S.Ct. 1272. The Affirmative Action

Sign-Off Forms provide other relevant data. There are a total of 55 forms reflecting situations in which there was at least one known black candidate for a full time faculty position. And it will be recalled that the hiring process selected a black for the position on six occasions or 10.9% of the time. While one needs to know more about the racial composition of the applicants for the positions which went to blacks in order to fully evaluate this data, it does tend to support the impression received from the non-statistical evidence that the University has sought out blacks.

**79.** 5171 of 6876.

lates to race". Even if this hypothesis be accepted, however, one must further ask what it is in the process which is related to race. There are three possibilities. First, it could be that the University's methods of recruitment, i. e., the dissemination of information about faculty vacancies, result in a low level of black exposure. Second, it could be that the decision-makers choose non-black candidates from the applicant pool at a rate disproportionate to their numbers. Finally, it could be that black academic candidates are able to choose among a number of employment opportunities and that a lower proportion of qualified blacks than qualified whites views the University of Delaware as a desirable place to be a faculty member. To the extent that a factor related to race does play a role in the selection of full time faculty at the University, the most reasonable reconciliation of all of the evidence, statistical and non-statistical, is that the third hypothesis is the correct one.

Since its inauguration in 1972, the Affirmative Action Program has provided a procedure designed to inform the black academic community regarding the University's faculty needs, the resource information necessary to implement that procedure, and a system to monitor compliance. While there have been isolated instances since 1972 when the procedure was not followed, as earlier noted, I am persuaded that the Affirmative Action Program has been generally honored by the faculty and that the black academics have in fact learned of openings at the University when they have occurred.

Turning to the selection process, it is true that the criteria utilized in the hiring of faculty are subjective and that they are applied on a decentralized basis.[80] However, these facets of the hiring process have not resulted in a disparate impact upon blacks. The Court has heard testimony concerning most of the 55 instances between 1972 and trial in which blacks were known to have been involved as candidates for full time faculty positions. Plausible, non-racially based, explanations were offered in those instances in which non-blacks were selected over blacks and the credibility of this testimony receives support from a review of the contemporaneously prepared and reviewed Affirmative Action Sign-Off Sheets. In addition, the record reflects numerous instances where extraordinary efforts were made to secure the services of blacks by offering preferred terms of employment and through other means. There is also evidence that when individual departments have been found wanting in their efforts to secure black representation on their faculties, the University administration has brought effective pressure to bear in order to achieve a response.

Lending further support to the hypothesis that the hiring procedures in the post-Act period have not been tainted with racial bias is a very significant gap in plaintiffs' evidence. Despite the voluminous testimony in this case, not one individual has been identified who claims to have been discriminated against in the hiring process on grounds of race, and, as earlier indicated, at least one of plaintiff's witnesses familiar with the University scene over a substantial period of time testified that he knew of no black who had been interested in employment with the University and who had been

---

**80.** Neither subjectivity nor decentralization of decision-making, of course, constitutes a per se violation of Title VII. The courts have recognized on numerous occasions, for example, that employment criteria for faculty appointments are necessarily subjective. E. g., *Sweeney v. Board of Trustees of Keene College,* 569 F.2d 169, 176 (1st Cir. 1978); *Peters v. Middlebury College,* 409 F.Supp. 857, 868 (D.Vt.1976); *Lewis v. Chicago State College,* 299 F.Supp. 1357, 1359 (N.D.Ill.1969). Similarly, it is to be expected that those best able to judge the professional qualification of a potential faculty member, i. e., those trained in his or her discipline, will play an important role in the decision-making process at any institution of higher learning. I need not decide, however, whether the degree of subjectivity and decentralization found in the hiring process at the University is justified by legitimate institutional interests. Only disparate impact needs to be so justified, and the record in this case does not suggest that the selection process at the University in fact operates to the disadvantage of blacks.

**1130**

unfairly denied a job opportunity. While I realize that a plaintiff in a disparate impact case is entitled to rely solely on statistics, the absence of any identified victim is nevertheless significant.

██ Based on the record as a whole, I think it highly unlikely that the University's subjective employment criteria and its decentralized decision-making process have resulted in blacks being adversely affected by the selection process.

The evidence which tends to negate the first two possible explanations for the University's underutilization of black faculty inferentially supports the validity of the third explanation. Three other categories of evidence provide support for this hypothesis as well. First, plaintiff's lay witnesses who testified as to the University's reputation in the black community and as to the difficulties of attracting black faculty members prior to achieving a "critical mass" clearly established that black academics generally have not viewed the University as an appealing employment location. Second, defendants' witnesses testified to numerous individual recruiting efforts which terminated in a black opting for another employment opportunity despite an offer or clear interest from the University. Finally, there was the data from the applicant supplemental forms which tends to show a significant gap, at least during 1974 and 1975, between the black applicant rate and

the black percentage of the relevant labor pool. Having concluded that evidence of the University's hiring needs did reach all segments of the relevant pool, including the black segment, this evidence tends to confirm that black preference is responsible for the disparity between the black proportion of the University's full time faculty and the black proportion of the pool from which they have come.

Based on all the evidence pertaining to the post-Act period, I conclude that the University's hiring practices did not adversely affect blacks during that period.

(2) *The Section 1981 claim.*

Having made the assumption that Section 1981 does not require a showing of discriminatory intent as a prerequisite to liability, the principal effect of plaintiff's reliance on Section 1981 [81] is to extend the scope of the search for disparate impact back to March 22, 1971. This suit was filed on March 22, 1974 and Section 1981 claims arising in Delaware are governed by a three year statute of limitations.[82] Thus, in order to establish a right to relief it is necessary to show that an employment system which adversely affected blacks was in existence on or after March 22, 1971.[83]

The record indicates that the hiring procedures utilized during 1971 and the first few months of 1972 were not the same as those in the Title VII period. It does not

81. Section 1981 provides:
   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

82. While plaintiff relies upon evidence relating to the mid-60's and earlier periods as circumstantial evidence supporting his claim that there has been a continuing pattern of intentional discrimination in hiring in the 70's, both he and the EEOC agree that the Section 1981 claim is subject to the three year limitations period prescribed by 10 Del.C. § 8106, and the evidence regarding those earlier periods is not relied upon as an independent basis for relief.

See *Marshall v. Electric Hose & Rubber Company,* 68 F.R.D. 287 (D.Del.1975) and *Guilday v. Department of Justice,* 451 F.Supp. 717 (D.Del.1978) (10 Del.C. § 8106 applicable to Section 1981 employment discrimination claim).

83. *E. g., Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). An employment practice which is racially neutral in its operation during the statutory period may, of course, have an adverse impact during that period if it perpetuates the effects of past discrimination. A hiring procedure which affords equal opportunity to blacks and which communicates that fact to the appropriate black community, however, does not perpetuate the adverse effect of a prior hiring practice which may not have afforded such opportunity.

suggest, however, that those procedures had a disparate impact or that blacks were otherwise denied equal employment opportunity during that period.

During the school year 1970–71, the affirmative action procedures which prevailed in the Title VII period had not yet been instituted. The record demonstrates, however, that by that year substantial changes had been made in the system which had produced no black faculty members prior to 1965 and only four black faculty members prior to September of 1968. As earlier recounted, in 1968, the administration made it clear to the members of the academic community generally that it was serious about hiring black faculty and solicited the aid of all of the members of its own community to that end. This commitment had begun to bear tangible fruit by 1970–71. We know from Dr. Scott's experience and that involving Dr. Hall's recruitment that special effort and preference was being accorded black candidates in 1971 to induce them to come to the University. Moreover, the new faculty hired in one year are ordinarily recruited during the preceding year and, it is, therefore, reasonable to infer that the six blacks hired for positions on the 1971–72 faculty were offered positions and persuaded to accept them in 1970–71.[84]

While the procedures used in the year preceding the adoption of the affirmative action program lacked some of the safeguards of the procedures in later years, given the productivity of the procedures utilized in the 1970–71 school year and the evidence of the preferences accorded blacks at that time, I am unwilling to conclude that these procedures had a disparate impact upon blacks.

C. *Subjectivity and decentralization—renewal, promotion and tenure.*

The University's tenure, promotion and renewal practices, like its hiring procedures,

involve subjective criteria and decentralized decision making. As with hiring, it is difficult to imagine procedures in these areas for an institution of higher learning which would not have these two characteristics. As earlier detailed, however, the various departments have substantially reduced the opportunity for discrimination by specifying how the more general criteria will be applied. Also as earlier noted, there is centralized review of departmental policy statements and of individual departmental recommendations. The limited evidence in the record reflecting the application of these procedures does not suggest that they have a disparate impact on blacks.

Dr. Siskin testified that, assuming a pool which is 2.55% black, the probability of finding two or less tenured black faculty members out of a total tenured faculty of 314 is 4.9%. It also appears that in 1976, 44.3% of the white faculty had tenure, while only 16.7% of the black faculty was tenured. These statistics have little probative value, however, in trying to assess whether the procedures for conferring tenure have a disparate impact. Tenure is almost always conferred upon people who are already on the University's faculty and who have been there for three to six years.[85] Accordingly, one must look to the University faculty as the primary pool and consider the experiences of black faculty members as contrasted with those of non-blacks.

Of the twelve black full time faculty at the time of trial, two were tenured and two were on the verge of being tenured. Of the remaining eight black faculty members, only four had been on the faculty for three years. Of these four, Gregory and Miles had only Bachelor's degrees, and Farrow and Washington had only Master's degrees. Thus, every black faculty member with a

---

84. While we do not know the total number of faculty members of all races hired in the 1970–71 school year, we do know that it was not a year of major growth in the size of the faculty (there was an increase of 30). We also know that six black hires in one year compares favorably with the productivity in the years of the

affirmative action found not to have had a disparate impact.

85. The record suggests that more than three years, and often as many as six, are usually required before tenure is achieved.

doctorate and with three or more years of service at the University was tenured or near tenure.[86] The only other black faculty members who have stayed at the University for more than three years in the past were Hilda Davis, a Ph.D. in Sociology, who had a special function in the Writing Center of the English Department, and Mary Farrell, who had only a Master's degree, and who was recommended for promotion (though not tenure) when she left the University in 1974. In addition, the University has attempted to hire Doctors Eubanks and Colson into tenured positions on its faculty.

The record on promotions is too sketchy to draw any inference. All we know is that there were some promotions of black faculty and that the EEOC found that two of the three blacks who became eligible for promotion between 1972 and 1975 were promoted.

Finally, with respect to renewals, there is no evidence of any black faculty member other than Dr. Scott who has not had his contract renewed. Indeed, no faculty member other than Dr. Scott is identified in the record as one claiming to be a victim of any racial discrimination in renewal, promotion or tenure at the University.

## CONCLUSION

As a part of its continuing Affirmative Action Program, the University committed itself in 1975 to attempt to hire a substantial number of new minority faculty members by 1980. Thus far, its efforts in pursuit of that goal have not borne the hoped for fruit. This may counsel review and change by the University. I conclude, however, that neither this shortfall nor the disparity between the percentage of blacks on the faculty and the percentage of blacks in the available pool is attributable to unjustified employment practices which have a disparate impact against blacks. Absent such impact, there is no occasion for judicial intervention. Since I also conclude that plaintiff has not been subjected to disparate treatment because of his race, judgment will be entered for the defendants.

---

**86.** In addition, Sills, who was close to tenure had only a Master's degree.